Gulf Refining Company *v.* Camp Curtin Trust
Company, Appellant.

Argued May 28, 1936. Before KEPHART, C. J., SCHAF-
FER, MAXEY, LINN, STERN and BARNES, JJ.

466

 

*C. C. Stroh,* of *Stroh & McCarrell,* for appellant.

*Frederick J. Templeton,* with him *Caleb S. Brinton* and *George Ross Hull,* for appellee.

OPINION BY MR. JUSTICE STERN, October 5, 1936:

Moses Karmatz, in 1924, executed and delivered to defendant a mortgage of $4,800 covering two properties in Dauphin County, one situate in the Seventh Ward of the City of Harrisburg and the other in the Borough of Steelton. In 1927 he executed and delivered to defendant another mortgage of $5,000 which covered only the Harrisburg property. In 1929 he sold and conveyed the latter property to plaintiff, the purchase price being $19,000. Of this amount plaintiff gave to defendant $4,618.75, which was the sum then required to satisfy the second or $5,000 mortgage on the property, and also $901.80 in payment of a note held by defendant against Karmatz; the remainder of the purchase price, after satisfaction of various judgment and tax liens on the property, was paid by plaintiff to Karmatz. Plaintiff was not aware of the first or $4,800 mortgage held by defendant, and its existence was ignored at the settlement. Subsequently Karmatz defaulted in the payment of interest on this mortgage, and defendant levied execution on the two properties covered by it. The execution on the Harrisburg property was temporarily stayed;

the Steelton property was sold by the sheriff but nothing was realized therefrom except taxes and costs. Plaintiff then filed a bill in equity to restrain defendant from proceeding on the execution against the Harrisburg property, and also to compel defendant to release on the record the lien of the mortgage as to that property. The court below granted the relief prayed for; defendant appeals.

The question involved in the case arises in the following manner: Exercising the authority conferred by the Act of May 26, 1891, P. L. 129, the Court of Common Pleas of Dauphin County in 1917 made an order directing that new indices for the books in the recorder's office should be procured and the indexing done thereafter according to the Russell L. M. N. R. T. System, to be installed in conformity with a certain "Sample B for mortgages" and specifications which had been recommended by a committee of the bar. In addition to the names of mortgagor and mortgagee, and place of record, which were required to be included in the index by the Act of March 18, 1875, P. L. 32, "Sample B" provided for columns in the index setting forth the date of the mortgage,[1] the date of recording, the amount of the mortgage, and the location of the property and "remarks," the location to be by wards and city or borough and township, unless there were more than three separate locations, in which event only a general reference to the county was required. In the present case, when the $4,800 mortgage was recorded the location of the property was indexed as Steelton, nothing being added to indicate that it covered also the Harrisburg property. This misled the attorneys for plaintiff who searched the title when their client purchased the latter property, with the result that they did not go beyond the indices and examine the record of the mortgage itself.

_____

[1] As actually prepared and in use, the indices in Dauphin County do not provide for the date of the mortgage.

The court below held that because of this defective indexing plaintiff was not bound by constructive notice of the $4,800 mortgage, and took title free and clear of its lien. In our opinion this was error. The court misapprehended the scope and purport of the Act of 1891. That act provided: "That the court of common pleas of the proper county is hereby authorized and empowered, whenever it shall appear advisable on inspection of the books of records and indices belonging to the several offices of prothonotary and clerks of the several courts, register of wills and recorder of deeds of such counties, by its order to change and alter the mode of preparing and keeping said indices in one or more of said offices and to direct the mode in which said indices shall thereafter be prepared and kept." Section 2 authorized the court to direct "new indices" to be prepared of all or any part of those theretofore prepared and kept in any of these offices.

This act cannot be interpreted to mean that the courts of the several counties were thereby invested with the power to establish indices containing data additional to that required by existing legislation with the legal effect that, if such additional data were omitted or erroneously stated, the record would not carry constructive notice to persons who otherwise would be bound thereby. Indeed, if the Act of 1891 were to be construed as vesting such power in the courts, its validity might be questionable as constituting a delegation of legislative power in violation of Article II, section 1, of the Constitution. All that it apparently was intended to accomplish was to give to the courts of the various counties the right to prescribe the *mechanics* of the system of recording,—to allow the counties to adopt new and improved methods for indexing the records, as, for illustration, by providing for a more detailed classification in the alphabetical arrangement of the indices. The act did not vest in the courts the right to make substantive changes in or additions to the recording statutes. If an order of the court

provided, for example, that the indices should furnish a physical description of the grantor and grantee, mortgagor and mortgagee, or other identifying data with regard to them, such an order would not write these additional requirements into the recording laws so that the record would be invalidated if the information thus supplied by the index happened to prove erroneous. Nor did the Act of April 23, 1903, P. L. 267, (which provided that the "new indices" to the records contained in the offices of the several county officers of the Commonwealth prepared in accordance with the Act of 1891 should be notice to all persons of the contents of such papers) extend the scope of the recording acts to the indices regardless of what they might include under the order of the county court. The phrase "new indices" in the Act of 1903 apparently refers only to those prepared under section 2 of the Act of 1891 to replace theretofore existing indices, and not generally to a new mode of keeping the indices as provided in section 1 of that act, the purpose of the Act of 1903 being to give the same legal status to the substitutionary indices as that of the old ones which they replaced. There was no need to make similar provision for the current indices kept under a new method, because they would be covered by section 3 of the Act of March 18, 1875, P. L. 32,[2] being only a continuation of the existing system with merely a new form of adaptation or arrangement. If, however, the Act of 1903 was meant to cover also the current indices kept under a new system ordered by the court, there is nothing in its terms to indicate a legislative intent that such indices should furnish any information as to the record beyond that required by the Act of 1875, or that if such additional information were furnished it should be binding upon the person whose title was involved.

---

[2] Section 3 provides that "The entry of recorded deeds and mortgages in said indexes, respectively, shall be notice to all persons of the recording of the same."

The court is of opinion, therefore, that whereas the "mortgagor," "mortgagee," and "where recorded" columns of the indices provided by the Act of 1875 contain data which have the effect of constructive notice, any additional information prescribed by the county courts under the Act of 1891, such as, in the present case, the "location and remarks" column, can be deemed to be furnished only by way of assistance or convenience to the searcher of the records, but not as constituting constructive notice, or impairing substantive rights because of omission or defective statement.

Plaintiff contends that, apart from the question of the index to the record, the operation of the principle of estoppel entitles it to the relief sought. This claim is based upon the fact that prior to making settlement for the property plaintiff's attorneys notified defendant that it was being purchased, and inquired as to the balance due on the $5,000 mortgage. During the course of the conversations which ensued plaintiff's attorneys told defendant they were "not interested" in paying any obligations of Karmatz except claims of record which would be liens against the property, but nothing was said by defendant to call plaintiff's attention to the existence of the $4,800 mortgage. Without discussing the question whether plaintiff revealed the exact situation to defendant so that ordinarily there would have been imposed upon defendant a duty to speak, it is sufficient to point out that the principle of estoppel by mere silence does not apply where an instrument of title has been recorded so as to fasten constructive notice upon the other party: *Crest v. Jack,* 3 Watts 238, 240; *Goundie v. Northampton Water Co.,* 7 Pa. 233, 239; *Knouff v. Thompson,* 16 Pa. 357, 363, 364; *Hill v. Epley,* 31 Pa. 331, 335; 10 *R. C. L.* 693, 694; *Bispham's Principles of Equity* (11th ed.), § 261, where it is said: "But silence will not always work an estoppel, for silence may not always be inequitable, and, moreover, a person is not bound under all circumstances to speak out. He may not, for ex-

ample, be bound to declare that which is a matter of record, and of which he has a right to presume the other party has notice." Since it has been here decided that the record of the mortgage did constitute constructive notice notwithstanding the defective statement in the index as to the location of the mortgaged property, the doctrine of estoppel cannot be successfully invoked.

The decree of the court below is reversed, and the bill is dismissed; costs to be paid by appellee.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

I dissent from the opinion of the court in this case and I would affirm the decree of the Court of Common Pleas of Dauphin County. Since that court in the exercise of the authority conferred on it by the Act of May 26, 1891, P. L. 129, established a new system of indexing deeds and mortgages in Dauphin County, and *as part of that system* directed that the indexes should show the *location* of the property by wards, city, borough or township, and since the Act of April 23, 1903, P. L. 267; 17 P. S. sec. 1987, provided that the "new indices to the several records" established by any court, in accordance with the provisions of the Act of 1891 (supra), "shall be notice to all persons of the recording of the [several papers] to which they refer, and of the full contents of such papers," it is clear to me that when the title searcher found by looking at the official index in the recorder's office that the Camp Curtin Trust Company held a mortgage against Moses Karmatz and that the index revealed that property so mortgaged was located in *Steelton,* and therefore by implication nowhere else, he had a right to assume that the index was a notice of the *full contents of those papers* (so far as it purported to be) just as the law said it was. Here we have a duly authorized order of court plus a subsequent act of assembly saying in substance: The indices to deeds and mortgages, in Dauphin County, shall point out the location by cities, boroughs, etc., of the property conveyed or mortgaged, and these

indices shall be notice to all persons of the full contents of such papers. In my judgment, *this makes indexing in the manner prescribed an essential part of the record- ing.* When the index said to the searcher the only property covered by this mortgage is located in Steelton, he could *rely* on that fact thus officially stated. If, for example, an official signboard in Dauphin County said in effect: This road (pointing to it) leads to Harrisburg while that road (pointing to another) leads to Steelton, the traveler interested in getting to Harrisburg would be justified in taking the road so indicated as the road to Harrisburg without making further inquiry. The Act of 1903, supra, is virtually meaningless unless we give it the recognition which the Dauphin County court gave it.

The majority opinion says: "Any additional information prescribed by the county courts under the Act of 1891, such as, in the present case, the 'location and remarks' column, can be deemed to be furnished only by way of assistance or convenience to the searcher of the records." I cannot see what "assistance or convenience" a "location" column in the index would render to a title searcher if what the index says under the heading of "location" cannot be relied upon. It would be far better to have in the index no "location" column whatsoever.

If title searchers cannot rely on official indices which purport to point out exactly where the land under inquiry is located, their labors will be multiplied many fold. It is not unusual for a grantor or mortgagor to convey or mortgage property in scores of places in the same county. Under the rule laid down in the majority opinion, if A is about to purchase from B, *land located in the town of Y,* and A finds in the index to mortgages, that B has mortgages entered against a hundred or more premises owned by him in the county, A must consult each one of these mortgages though the index reveals no mortgage on the property of B located in locality Y. Under this ruling I dissent from, a "location" column in

the index serves no function except to lull title searchers into perilous "security." Any legal device or system that is palpably misleading should not be permitted to exist. I cannot subscribe to the view that the court of Dauphin County did a vain thing when in 1917 it ordered the recorder to install new indices, with six columns, including a column *indicating* the *location* of the property mortgaged, and that the Act of 1903, supra, does not mean what it appears to mean when it declares that "such indices shall be notice to all persons of the recording of the deeds, mortgages, etc., to which they refer and *of the full contents of such papers,*" so far, of course, as the index refers to such contents (italics supplied).

The majority opinion also says: "All that it [the Act of 1891] apparently was intended to accomplish was to give to the courts . . . the right to prescribe the *mechanics* of the system of recording,—to allow the counties to adopt new and improved methods for indexing the records, as, for illustration, by providing for a more detailed classification in the alphabetical arrangement of the indices." It did not require any further act of assembly to prescribe the mere "mechanics" of recording deeds and mortgages, and of indexing them. "Mechanics" were already provided for by the Act of March 18, 1875, P. L. 32, section 1, 16 P.S. 3391. This act sets forth that the recorder of deeds shall keep two general indexes of all deeds and mortgages recorded in his office, "said indexes shall be arranged alphabetically and in such a way as to afford an easy and ready reference to said deeds and mortgages respectively." Under this act the recorder already had the power to provide "for a more detailed classification in the alphabetical arrangement of the indices." A further answer to the above excerpt from the majority opinion is found, I think, in the Act of 1903, supra, in which the legislature refers to the indices installed pursuant to court orders under the Act of 1891 as "new indices" and declares

that they "shall be notice . . . of the contents of such papers," i. e., the deeds, mortgages and other papers recorded. Notice means, of course, the giving of information. In the instant case the title searcher was given *official information* by the index that the $4,800 mortgage he found, *related only to property in Steelton.* He had a right to rely on this.

The majority opinion further says: "The phrase 'new indices' in the Act of 1903 apparently refers only to those prepared under section 2 of the Act of 1891 to replace theretofore existing indices, and not generally to a new mode of keeping the indices, as provided in section 1 of that act, the purpose of the Act of 1903 being to give the same legal status to the substitutionary indices as that of the old ones which they replaced." I find no basis for this interpretation of the phrase "new indices" in the Act of 1903. Section 1 of the Act of May 26, 1891, P. L. 129, provides for the changing and altering by the court of common pleas of the proper county, of "the mode of preparing and keeping indices" in the offices referred to. Section 2 of the same act provides that the court, whenever it shall appear advisable, may order "new indices to be prepared and made of the *whole* or any *part* or *parts* of the indices theretofore prepared and kept . . ." (Italics Supplied.) The Act of 1903 contains only one section and does not specifically refer either to section 1 *or* section 2 of the Act of 1891. It simply provides that new indices, made pursuant to the order of court under the Act of 1891, "shall be notice to all persons of the recording of the [several papers], *and of the full contents of such papers*" (italics supplied). In other words, the legislature in 1891 said to the courts: "You may alter the mode of indexing papers in your county offices" and (section 2) "whenever you decree it advisable you may make new indices *of the whole or any part of the old indices* and also direct the mode in which *new indices* shall be prepared and kept." (Italics supplied.) In *Nicely v. Raker,* 250 Pa. 386, 95 A. 556, this

court, in an opinion by Mr. Justice FRAZER, said: "The Act of 1891 vests in the court the sole power of changing or altering the mode of preparing and keeping indexes in the several offices of record, in each county, and whenever 'it shall appear advisable' to direct new indexes to be prepared and made."

The third section of the Act of 1875, referred to in the majority opinion, merely provided that the entry of recorded deeds and mortgages in said indexes, i. e., the general indexes (provided for in that act), "shall be notice to all persons of the recording of the same." It appears to me that the legislature in the Act of 1891, recognizing the fact that real estate transactions had greatly multiplied, in at least the more populous counties, wished to clothe the courts of common pleas of the several counties with power to order a *more detailed* system of indexing and in 1903 attempted to remove all doubt that whatever the more detailed indexes duly prescribed by the courts revealed as to the contents of the instruments recorded, should constitute "notice to all persons not only *of the recording* of the several papers (as was already the fact under the Act of 1875), but also of *their contents* so far as the index purported to reveal them.

The majority opinion further says: "If the Act of 1891 were to be construed as vesting such power in the courts, its validity might be questionable as constituting a delegation of legislative power in violation of Article II, section 1, of the Constitution." No such question is raised in this record, but if it were it should give us no trouble. I think the Act of 1891 is no more open to the charge of being an unconstitutional delegation of legislative power than is section 21 of the Act of June 16, 1836, P. L. 784, 17 P.S. section 2076 (and similar subsequent acts), which gives to courts of common pleas the "full power and authority to establish such rules for regulating the practice thereof respectively, and for expediting the determination of suits, causes and proceedings therein, as in their discretion they shall judge nec-

essary or proper: Provided, That such rules shall not be inconsistent with the Constitution and laws of this Commonwealth." These rules often affect substantive rights and this court has repeatedly declared that they have the force of law. In the case of *Rohrer v. Milk Control Board,* 322 Pa. 257, 186 A. 336, this court held that the Milk Control Law of January 2, 1934, P. L. 174, which regulates the milk industry by requiring dealers to be licensed by a board created under its provisions, prohibiting those not so licensed from dealing in milk and milk products, and giving said board the right to fix the minimum prices to be paid the producer and the minimum and maximum prices to be charged the consumer, is not unconstitutional as containing an unlawful delegation of the legislative power in violation of Article II, section 1, of the Constitution. In the case of *Gima v. Hudson Coal Co.,* 106 Pa. Superior Ct. 288, 300, 161 A. 903, that court, in an opinion by Judge KELLER, said: "Both the Anthracite and Bituminous Mine Laws are replete with instances of powers granted to mine bosses, mine foremen, mine inspectors, and similar officials who do not legislate, but who are authorized to do certain things and give orders which must be obeyed by the miners and their laborers, and violation of which constitutes an offense against the mine laws." The judgment of the Superior Court in that case was affirmed by this court in 310 Pa. 480, 165 A. 850.

As early as 1864, in the case of *Speer v. Evans,* 47 Pa. 141, this court said that a mortgage "not duly indexed" was not "constructive notice to third parties" of its existence. "As a guide to inquirers, the index is an indispensable part of the recording, and, without it, the record affects no party with notice," declared Chief Justice WOODWARD in that case. (The decision in that case turned upon the question of actual notice.) In *Prouty v. Marshall,* 225 Pa. 570, 74 A. 550, it appears on January 20, 1900, L. J. Marshall executed and delivered to Agnes Prouty a purchase-money mortgage, secured upon

premises in Dubois Borough, Clearfield County. It was duly delivered and recorded. The recorder, however, had not recorded the mortgage as executed by L. J. Marshall and had not indexed it under the name of L. J. Marshall. Upon the record the name of the mortgagor, wherever it appeared, was written "S. J. Marshall," and the only name entered on the indexes was that of "S. J. Marshall." The property was later purchased by A. A. La Rue who had no notice of the mortgage. Against a scire facias later issued, La Rue, the terre-tenant, defended upon the ground that neither the mortgage books nor the mortgage indexes in the recorder's office showed any mortgage executed by L. J. Marshall or contained any record of the mortgage sued on. In that case this court, in an opinion by Mr. Justice POTTER, said: "The great object to be attained, by recording and indexing an instrument affecting the title to real estate, is to give notice of the encumbrance. . . . In the present case, the mortgage sued upon was never correctly recorded. . . . The same error was made in indexing the instrument. It was indexed as S. J. Marshall. As the statute requires the recorder to keep mortgage indexes and . . . expressly provides that the entry of mortgages in said index, shall be notice to all persons of the recording of the same, the appellant here was entitled to rely upon what appeared on the index, and that showed no mortgage given by L. J. Marshall. . . . He [the purchaser] took the land free of any such encumbrance, and it cannot be enforced against him. . . . It should be remembered that in this case the mortgage was neither recorded properly nor indexed properly; both recording and indexing were alike defective, and each of the defects was fatal to the claim of the mortgagee." The foregoing is a clear recognition on the part of this court that either a defective recording or a defective indexing is fatal to the claim of the one who relies upon the mortgage. In the above case the court said further: "In the case at bar, the duty was upon the mortgagee to give notice that

L. J. Marshall had executed to her a mortgage upon the premises in question. If from any cause she fell short of giving legal notice, the consequence must fall upon her. She cannot hide behind the mistake of the recorder. . . . The duty thus imposed upon the mortgagee in this respect, involves no more, and no less, than is required of a mortgagee, for his own protection, when before the money is paid out upon the loan, an inspection of the judgment indexes is necessary to see whether or not a judgment has been entered against the mortgagor upon the same day on which the mortgage is recorded."

In *Arch Street B. & L. Assn. v. Sook,* 104 Pa. Superior Ct. 269, 158 A. 595, the facts were that a husband and wife owned certain real estate as tenants by entireties and that judgment was confessed against them on a note. The judgment was indexed separately against each of them, but the judgment as indexed against the wife omitted her middle initial. It was held that the omission of the middle initial in the wife's name was fatal to the creation of a lien. President Judge TREXLER, speaking for the Superior Court, said: "When Mrs. Sook took this mortgage [from Charles W. Geick and Bertha L. Geick, his wife], she was not bound to look beyond the entry of the judgment as docketed by the prothonotary. She was not bound to go further than the docket: *Crutcher v. Com.,* 6 Wharton 340; *Winton's Appeal,* 2 Central Reporter 601, 5 A. 433. The fact of the identity of these two judgment debtors as their names appear in the separate judgments entered against them respectively, with the holders of the title of the property against which the mortgage was a lien could not be learned by inspection of the judgment index, because of the omission of the middle initial of the wife." That case is a clear recognition of the fact that a searcher for liens may rely on an official index.

In other states which provide by law for detailed indexes to deeds and mortgages recorded, it has been held that a title searcher has a right to rely on the informa-

tion these indices contain. For example, the State of Iowa requires the recorder of deeds and mortgages to keep an index in which he shall enter *the names of the parties thereto, the date of filing, the date and nature of the instrument, the book and page where recorded, and the description of the property conveyed, in parallel columns.* In *Scoles v. Wilsey,* 11 Iowa 261, an action was brought by a mortgagee who contended that the recitals in the mortgage were such as would necessarily put a prudent and cautious man upon his guard, and bind a subsequent purchaser to a diligent inquiry into the character of the mortgagor's title. The Supreme Court of Iowa said that "this would be the case where the provisions of the registry law simply required the recorder to index the names of the parties through whom titles would be traced and encumbrances searched for. In such a case the instrument as recorded would have to be read at least in part, and the recitals in all probability would fall under his observation," but under the laws of Iowa, "a searcher for encumbrances, would have no occasion to look beyond the index book until he found a piece of property which *in description* [italics supplied] would correspond with that the title of which he was investigating." The court held *in that case* that though there was an error in the description of the property under the subheading of "Description" in the index, *the searcher could rely upon that description and need not go to the record of the mortgage for further information.* The defendant, having been misled by the index, was not bound by the recitals in the mortgage. In *Noyes v. Horr,* 13 Iowa 570, the plaintiff's mortgage was upon two distinct tracts of land. The recording official omitted in the index or entry book to give any description whatever of the last of these two tracts while he did describe in the proper column the first tract. The defendants were junior mortgagees upon the last tract and they set up a claim that plaintiff's mortgage had not been legally or sufficiently recorded to impart to them any

constructive notice of the lien on the last tract. The Iowa Supreme Court said: "Finding one tract of land duly described in the general index, and *that* not answering to the one which the searcher for encumbrances was investigating, and there being nothing to indicate that there was a second tract included in the same mortgage, or no other note or memorandum that would put a reasonably cautious person upon inquiry," the record was not constructive notice to subsequent purchasers of the tract of which the description was omitted. In *Peters v. How & Co.,* (Iowa) 18 N. W. 296, the court held that where a mortgage erroneously describes the premises, and the index in the record follows the erroneous description, a purchaser is not affected with constructive notice of the mortgage from the mere fact that by examining the engrossed record he might have ascertained the error.

In *Merchants & Farmers Bank v. Harrington et al.,* 193 N. C. 625, 137 S. E. 712, it was held that though a mortgage was on its face a combination of chattel and real estate mortgage, it, because of being indexed only on general cross-index of chattel mortgage kept in a separate index from land instruments, was junior to a subsequent mortgage on the same land duly recorded and duly indexed. In *Lombard v. Culbertson,* 59 Wis. 433, 18 N. W. 399, it was held that the object of the registry laws could be secured only by making the correct index entries. In *Congregational Church Bldg. Soc. v. Scandinavian Free Church,* 24 Wash. 433, 64 Pac. 750, it was held that the indexing of a mortgage under the name "Scandinavian Free Church" was such mistake as not to afford constructive notice to a subsequent mortgagee.

In the case of *Ritchie v. Griffiths et al.,* 25 Pac. 341, the Supreme Court of Washington held that the mere delivery of a deed to the proper office for recording is not constructive notice to a bona fide purchaser, where the recording officer neglects to record the same *in ac-*

*cordance with the registry law,* i. e., that until the record is made in strict conformity with the law, it affects no party with notice. The court said: "The recorder cannot be considered the agent of the purchaser. . . . It is a much fairer construction of the law . . . to consider him the agent of the party who has the business transaction with him, who gets him to do the work. And to him he should be responsible for any damage flowing from his refusal or neglect to do the work according to the contract between them; and that contract is, either express or implied, that the instrument shall be recorded according to law. That is what the grantee pays him to do, and he must see to it that his work is done right, or accept the consequences as between himself and the third parties, who are misled. . . . The law imposes upon him the duty of having his deed recorded. It is not the *attempt* to record a deed that the law requires; but it is the *recording* of the deed. . . . The obligation rests upon the grantee to give the notice required by the law. He controls the deed. He can put it on record or not, as he pleases. He has the right and the opportunity to see that the work is done as he directs it to be done, in legal manner. No one else has this opportunity, and if, from any cause, he fails to give the notice required by law, the consequences must fall on him." That court held that the index was an essential part of the record under the registration laws of Washington. It said further: "Laws are enacted for the benefit of the citizen; not only in theory, but in practice. They are not intended as pitfalls for the feet of the unwary. The state provides *in express terms for the keeping of this index. . . . He* [*the citizen*] *has a right to presume that the law has been obeyed.* If there was no such law, and he had abundance of time, and untold patience, he might devote himself to the task of examining the vast accumulations of records, page by page; *but with the law in effect, and the universal custom recognized of examining the record through the index, if the instrument is not indexed, the*

*law, instead of aiding and protecting the citizen, becomes a delusion and a snare, and a ready vehicle for collusion and fraud."* (Italics supplied.)

Holding as I do that since the recorder failed to index the $4,800 mortgage of Karmatz in the manner prescribed by law, no constructive notice of the fact that this mortgage covered property in Harrisburg as well as in Steelton, was visited upon the plaintiff, and that therefore he is in a position to invoke the doctrine of estoppel against defendant, as the court below found that he was, I agree with that court that "the defendant by reason of the failure of its Secretary and Treasurer, at the time of the purchase of the property by the plaintiff, the payment and satisfaction of the second mortgage and payment of the unsecured promissory note, to inform the plaintiff of the lien of the first mortgage and [to make] demand for payment thereof by defendant until February, 1935, the defendant is estopped from now asserting its lien of the said first mortgage on the said property against the plaintiff." Nothing can be more apt than the quotation from Chancellor KENT in *Wendell v. Van Rensselaer,* 1 Johns Ch. 344, cited by the court below as follows: "There is no principle better established in this court, nor one founded on more solid foundations of equity and public utility, than that which declares that if one man, knowingly, though he does it passively, by looking on, suffers another to purchase or expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel." Equally apt is the following quotation from the opinion of the court below: "In the case of *Marion W. Sumner v. George Seaton,* 47 N. J. Equity Reports, 103, where the subject is considered at length it was amongst other things held: 'Where one person looks on and sees that another is acting upon a mistaken

supposition as to his rights as against the on-looker, and in such manner that he will be seriously injured by the assertion of those rights by the on-looker, and does not warn the party so acting of his mistake, the on-looker will be estopped from asserting his rights against the other, except upon terms of indemnifying him.' "

I would affirm the decree of the court below.